Bardahl Manufacturing Corporation v. Commissioner.
Bardahl Mfg. Corp. v. Commissioner
Docket No. 2917-63.
United States Tax Court
T.C. Memo 1965-200; 1965 Tax Ct. Memo LEXIS 128; 24 T.C.M. (CCH) 1030; T.C.M. (RIA) 65200; July 23, 1965
Joseph H. Trethewey, White-Henry-Stuart Bldg., Seattle, Wash., for the petitioner. Richard H. M. Hickok and Wesley A. Dierberger, for the respondent. WITHEY
Memorandum Findings of Fact and Opinion WITHEY, Judge: The respondent determined deficiencies in petitioner's income tax for the years and in the amounts as follows: Year ended
December 31
Deficiency
1956
$ 47,607.70
1957
77,997.79
1958
259,471.08
1959
263,771.03
The sole issue presented for our decision is whether petitioner was availed of during each of the years 1956 through 1959, inclusive, for the purpose of avoiding the imposition of individual income tax on its shareholders, by permitting its earnings and profits to accumulate instead of being divided or distributed. Additional issues presented by the pleadings have been disposed of by concession or stipulation of the parties. Findings of Fact Petitioner Bardahl Manufacturing Corporation (sometimes hereinafter referred to as Manufacturing or the corporation) was organized under the laws of the State of Washington during September 1939. Petitioner filed its income tax returns for the years 1956, 1957, 1958, and 1959 *130 with the director at Tacoma, Washington. The corporation's principal place of business is located at Seattle, Washington. Bardahl Manufacturing Corporation has been engaged in the business of manufacturing an oil additive known as "Bardahl" since the commencement of business in 1939. From 1939 to 1955 it was also engaged in the business of selling the Bardahl additive. The corporation was a pioneer in the oil additive business. During the years here pertinent it also has manufactured certain related products such as gasline antifreeze, engine cleaner, carburetor cleaner, a water pump lubricant, a lubricant for transmission and differentials, and an outboard motor oil. During 1954 Bardahl International Corporation (sometimes hereinafter referred to as International) was organized under the laws of the State of Washington. Pursuant to a contract executed by Manufacturing and International on January 1, 1955, Manufacturing agreed to sell its entire production to International which in turn undertook the responsibility of acting as the sole sales representative of Manufacturing. At all times here material, Ole Bardahl, individually, was the principal stockholder of both Bardahl *131 Manufacturing Corporation and Bardahl International Corporation and also served as president of each corporation. During the years 1956, 1957, 1958, and 1959 the outstanding common stock of Bardahl Manufacturing Company was held by the individuals and in the amounts as follows: 1956
1957
Number
Percent
Number
Percent
of
of
of
of
total
total
shares
shares
shares
shares
Grace or Herbert Allen
15-5/8
18-3/4
Bardahl, Inga
12-1/2
.1
15
.1
Bardahl, Ole
10,898-75/80
87.1
13,078-58/80
87.1
Bartlett, Hugh
6-1/4
7-1/2
Baurle, William
3-1/8
3-6/8
Beck, H. C.
7-13/16
9-6/16
Brown, Dean M.
23-7/16
28-2/16
Chalaas, Clara M.
6-1/4
7-1/2
Doll, George
7-13/16
9-6/16
Gatt, Chin
31-1/4
Halvarsen, H. J.
7-13/16
9-6/16
Hard, Eve
156-1/4
187-1/2
Ireland or White
12-1/2
15
Jessen, J. or M.
46-7/8
56-2/8
Langton, M. B. or A.
15-5/8
18-6/8
Flood, Grace
7-13/16
9-6/16
Merritt, B.
1-9/16
1-14/16
Merritt, C. B. or C.
115-5/40
138-6/40
Nicolaysen, E.
507-13/16
609-6/16
Noritake, M.
78-1/8
93-6/8
Peterson, G.
7-13/16
9-6/16
Rice, H.
3-1/8
3-6/8
Ridgeway, Dr. G. R.
15-5/8
18-6/8
Simpson, Lillian
507-13/16
4.1
609-6/16
4.1
Wiggs, G. B.
3-1/8
3-6/8
Lee, Alice
37-1/2
Seattle Trust - Pension Fund
Seattle Trust - Profit Sharing Fund
Burkey, Louis J.
Seattle Trust - L. Simpson
Seattle Trust - E. Nicolaysen
Seattle Trust - Eric B. Nicolaysen
Seattle Trust - Kurt B. Nicolaysen
Seattle Trust - Wade B. Nicolaysen
Seattle Trust - Nancy Nicolaysen
12,500
100%
15,000
100%
*132 1958
1959
Number
Percent
Number
Percent
of
of
of
of
total
total
shares
shares
shares
shares
Grace or Herbert Allen
21-7/8
25
Bardahl, Inga
17-1/2
.1
20
.1
Bardahl, Ole
15,208-41/80
86.8
14,521-11/70
72.6
Bartlett, Hugh
8-3/4
10
Baurle, William
4-3/8
5
Beck, H. C.
10-15/16
12-1/2
Brown, Dean M.
32-13/16
37-1/2
Chalaas, Clara M.
8-3/4
10
Doll, George
10-15/16
12-1/2
Gatt, Chin
Halvarsen, H. J.
10-15/16
12-1/2
Hard, Eve
218-3/4
250
Ireland or White
17-1/2
20
Jessen, J. or M.
65-5/8
75
Langton, M. B. or A.
21-7/8
25
Flood, Grace
10-15/16
Merritt, B.
2-3/16
2-1/2
Merritt, C. B. or C.
161-7/40
184-1/5
Nicolaysen, E.
710-15/16
872-1/2
Noritake, M.
109-3/8
125
Peterson, G.
10-15/16
12-1/2
Rice, H.
4-3/8
5
Ridgeway, Dr. G. R.
21-7/8
25
Simpson, Lillian
710-15/16
4.1
872-1/2
4.4
Wiggs, G. B.
4-3/8
5
Lee, Alice
43-3/4
50
Seattle Trust - Pension Fund
25
.1
28-4/7
.1
Seattle Trust - Profit Sharing Fund
25
.1
28-4/7
.1
Burkey, Louis J.
12-1/2
Seattle Trust - L. Simpson
1,250
6.3
Seattle Trust - E. Nicolaysen
1,250
6.3
Seattle Trust - Eric B. Nicolaysen
60
.3
Seattle Trust - Kurt B. Nicolaysen
60
.3
Seattle Trust - Wade B. Nicolaysen
60
.3
Seattle Trust - Nancy Nicolaysen
60
.3
17,500
100%
20,000
100%
*133 Under the contract executed by Manufacturing and International on January 1, 1955, Manufacturing agreed to undertake the production of Bardahl concentrate which is the basic ingredient that is blended with oil to produce the Bardahl additive. Manufacturing also undertook responsibility for the quality control of its oil additive and for conducting research and development with a view to producing new products. International at all times here material was exclusively a sales organization and undertook no manufacturing or production activities. It distributed Bardahl concentrate during the years in issue to various blenders and distributors located in the United States and in foreign countries with which it had executed franchise contracts. The blenders purchased the Bardahl concentrate and blended it with oil to produce a marketable product which, after canning, was distributed to retail outlets and sold to consumers. The franchise distributors, on the other hand, purchased the finished Bardahl additive and sold it themselves. During the years in issue neither petitioner nor International had any capital investment in either the blenders or distributors of Bardahl additive (with *134 the exception of Bardahl International Oil Corporation, S.P.A., an Italian corporation formed in 1959 on petitioner's behalf to manufacture concentrate in Europe). The blenders and distributors (except for Bardahl International Oil Corporation, S.P.A.) during the years here pertinent were wholly owned by individuals unrelated to either of the Bardahl corporations. Petitioner maintained quality control over its additive by means of running chemical tests on raw materials throughout the manufacturing process and by testing samples of products marketed by the franchise blenders and distributors. During 1959 and 1960 Bardahl Manufacturing Corporation organized wholly-owned subsidiaries located in foreign countries to manufacture its concentrate. Its foreign subsidiaries manufactured and blended the concentrate in accordance with formulae and procedures determined by Manufacturing. The foreign subsidiaries of petitioner which which manufactured its concentrate during 1960 and subsequent years were located in Montreal, Canada, and Milan, Italy. The concentrate plant located in Montreal was owned by Bardahl Lubricants (Canada), Ltd., and the manufacturing facilities located in Italy were *135 controlled by Bardahl International Oil Corporation, S.P.A. The accumulated earnings and profits of Bardahl Manufacturing Corporation as of December 31, 1955 through 1959, were as follows: Year ended
December 31
Amount
1955
$ 819,686.18
1956
965,039.74
1957
1,194,483.15
1958
1,540,049.28
1959
1,880,097.17
Petitioner's sales, net income before taxes, Federal taxes paid, net income after taxes, and cash dividends paid, both in dollar amounts and percentages, from 1939 through 1962 were as follows: Percent of
Net
Net
net income
income
Federal
income
Cash
distributed
before
taxes
after
dividends
as cash
Year
Sales
taxes
paid
taxes
declared
dividends
1939
$ 188
1940
1,108
1941
2,956
1942
3,895
$ 317
$ 98
$ 219
1943
14,550
959
239
720
1944
19,228
3,948
987
2,961
1945
39,318
7,237
1,854
5,383
1946
68,211
13,259
2,949
10,310
1947
64,583
2,352
494
1,858
1948
155,321
26,454
6,520
19,934
1949
266,786
71,192
27,053
44,139
$ 5,953
13.5
1950
404,714
107,133
40,246
66,887
9,305
13.9
1951
865,667
336,835
223,570
113,265
1952
788,516
226,492
146,952
79,540
3,988
5.0
1953
1,172,931
282,228
192,341
89,887
9,985
11.1
1954
1,400,804
571,482
291,670
279,812
13,967
5.0
1955
1,236,093
456,206
231,474
224,732
30,000
13.3
1956
1,208,322
402,782
203,856
198,926
50,000
25.1
1957
$1,360,576
$524,836
$266,448
$258,388
$ 30,000
11.6
1958
2,123,333
758,613
388,858
369,755
17,500
4.7
1959
2,348,390
941,689
483,464
458,225
100,000
21.8
1960
1,375,435
126,449
60,195
66,254
67,500
101.9
1961
1,973,779
618,881
309,066
309,815
112,500
36.3
1962
1,788,242
431,161
206,783
224,378
112,500
50.1
*136 The income and expenses of the Bardahl Manufacturing Company for the years ended December 31, 1956 through 1959, inclusive, were as follows: 1956
1957
1958
1959
GROSS INCOME: Net sales
$1,208,321.85
$1,360,575.93
$2,123,332.92
$2,348,389.71
Less-Cost of sales
532,692.15
539,877.53
902,560.33
993,602.15
Gross profit from
675,629.70
820,698.40
1,220,772.59
1,354,787.56
sales
Interest received
9,396.93
13,559.81
11,338.58
24,317.92
Rents
9,390.00
12,710.00
18,926.07
19,830.00
Gain on sale of
333.80
3,579.92
448.46
2,645.51
capital assets
Other income
5,456.60
3,237.21
8,610.04
9,984.21
700,207.03
853,785.34
1,260,095.74
1,411,565.20
EXPENSES: Salaries and wages,
99,877.50
105,334.60
105,050.67
108,910.50
excluding factory
payroll
Taxes
34,355.46
38,193.32
53,394.79
59,599.42
Contributions
511.00
546.00
566.00
540.50
Depreciation
28,517.41
30,646.33
32,546.00
68,915.09
Advertising
92,741.30
102,349.89
236,760.11
155,876.18
Contribution to
15,647.80
21,397.41
24,172.84
25,286.95
pension and
profit-sharing plans
Interest
451.12
36.06
Other expenses
25,323.49
30,445.94
48,992.66
50,747.57
297,425.08
328,949.55
501,483.07
469,876.21
Income before Federal
402,781.95
524,835.79
758,612.67
941,688.99
income tax
Federal income tax
203,856.49
266,448.03
388,857.51
483,463.99
Net income
198,925.46
258,387.76
369,755.16
458,225.00
*137 The Bardahl oil additive is a highly promotional product and is subject to rapid fluctuations in the market place. It is a luxury type product and requires extensive national advertising in order to create a consumer demand. Manufacturing produced animated spot advertisements for its motor oil additive beginning about 1953. Such spot advertisements were carried over television stations in the United States and have proven successful in creating a nationwide advertising image of the Bardahl name and product. The oil additive industry is a highly competitive field of business which includes numerous competing products. During the years 1956 through 1959 there were at least 45 different oil additives marketed which were competitive with petitioner's additive. Among the products competing with the Bardahl additive were those marketed by Shell Oil Company, Dupont, General Motors Corporation, Wynn Oil Company, Quaker State, and Chrysler Corporation. It was the practice of the petitioner during the years here in issue to invest sizable amounts of its liquid funds in temporary securities such as Government notes, Treasury bills, municipal bonds, or readily convertible debentures, and *138 occasionally in cash deposits in a savings and loan association, so as to enable its unused working capital to earn a small interest return and still be available when needed for the demands of its business operations or for financing capital improvements. At the end of each of the years in issue, petitioner held governmental obligations in the following amounts: December 31
Amount
1956
$205,263.98
1957
204,857.73
1958
208,717.14
1959
556,889.80
On August 23, 1954, Manufacturing deposited $35,000 with the Ballard Savings & Loan Association. On December 31, 1959, petitioner's balance in this account, including accumulated interest, was $41,634.80. During 1956 Bardahl International Corporation in the ordinary course of business incurred trade receivables due to Manufacturing in amounts between $60,000 and $90,000. In 1958 International in the ordinary course of business incurred a trade receivable due petitioner in the amount of $81,787.17 which was paid in full during January 1959. Throughout the years in question petitioner held 8 percent debentures of the Coast Mortgage Company in the total face amount of $40,000. By agreement with the issuer the debentures *139 were cashable on demand by Manufacturing. The Coast Mortgage Company maintained a cash reserve for this purpose at all times during the years 1956 through 1959. The current assets and current liabilities of Bardahl Manufacturing Corporation on December 31, 1956 through 1959, inclusive, were as follows: Current Assets
1956
1957
1958
1959
Cash
$300,566.79
$ 390,993.39
$ 327,597.63
$ 372,262.49
Notes and accounts
123,773.22
255,346.45
512,037.00
622,891.68
receivable
Inventories
105,419.27
126,214.08
97,176.43
79,070.23
Government securities
205,263.98
204,857.73
208,717.14
556,889.80
Coast Mortgage debentures
40,000.00
40,000.00
40,000.00
40,000.00
Total current assets
775,023.26
1,017,411.65
1,185,528.20
1,671,114.20
Current Liabilities
Accounts payable
4,956.37
55,634.42
26,689.62
86,038.55
Mortgage payable within
3,357.58
one year
Accrued liabilities
42,095.15
54,034.53
50,899.80
52,629.42
Federal income tax payable
172,956.49
235,230.03
322,278.30
339,035.23
Dividends payable
51,594.50
32,688.25
20,871.25
102,682.21
Total current liabilities
274,960.09
377,587.23
420,738.97
580,385.41
Petitioner's *140 net liquid assets (consisting of its total current assets less its total current liabilities) as of December 31, 1956 through 1959, inclusive, were (rounded to the nearest dollar) $500,063, $639,824, $764,789, and $1,090,729, respectively. Operating Costs Petitioner's annual operating costs (excluding depreciation and Federal income taxes), cost of goods sold, and the total of the two for 1955, 1956, 1957, 1958, and 1959 were as follows: Operating costs [1]
Year ended
(less depreciation and
Cost of
Dec. 31
Federal income taxes)
goods sold
Total
1955
$242,474.07
$540,515.73
$ 782,989.80
1956
268.907.67
532,692.15
801,599.82
1957
298,303.22
539,877.53
838,180.75
1958
468,937.07
902.560.33
1,371,497.40
1959
400,961.12
993,602.15
1,394,563.27
Manufacturing's operating cycle, consisting of the period of time required to convert cash into raw materials, raw materials into an inventory of marketable Bardahl products, the inventory into sales and accounts receivable, and the period required to collect the outstanding accounts, averaged approximately 4.2 months during the 4 years here in question. *141 Petitioner required working capital as of the end of each of the years in question at least in an amount sufficient to cover its reasonably anticipated costs of operation for a single operating cycle. Since its operating cycle during the period 1956 through 1959 averaged approximately 35 percent of a year, its working capital requirements for the continuation of its normal operations amounted to approximately 35 percent of its reasonably anticipated (and steadily increasing) total annual operating costs and cost of goods sold as of the end of each of the years in issue. Accordingly the amounts of working capital reasonably anticipated by Manufacturing as being necessary to finance its costs of normal operations as of December 31, 1956, 1957, 1958, and 1959 were $293,400, $480,000, $488,000, and $488,100, respectively. Plant Expansion During the years 1956 through 1959 Bardahl Manufacturing Corporation and Bardahl International Corporation occupied the same premises located in Seattle, Washington. Manufacturing owned all of the land, buildings, and other physical assets. International paid Manufacturing a rental in the amount of $725 per month prior to 1958 for the office space *142 and warehouse facilities which it occupied. The minutes of the meeting of the stockholders of Bardahl Manufacturing Corporation held March 12, 1956, stated in part as follows: There followed a general discussion on the financial progress of the company and to what extent the company would necessarily need to expand. It was brought to the attention of the stockholders that the company would need additional warehouse space and that also it would soon be necessary to add another floor to the office of the present building. It was estimated that it would require approximately $300,000 to accomplish this improvement. The discussion was closed by the president, with the understanding that the matter would be placed before the board of directors at their next annual meeting which would follow the present stockholders meeting. The minutes of the meeting of the board of directors of Bardahl Manufacturing Corporation held March 12, 1956, contained the following statement: The President, in his comments on the outlook for the future, announced that very soon it would be necessary to provide additional warehouse space, and that considering the rapid growth of the business, it was imperative *143 that the business office space be increased and improved by adding another floor of office space to the present office building. The President stated that, in his opinion, the sum of approximately $300,000.00 would be required to carry these proposals to completion, and that while it would not be possible to accomplish the completion of these projects during 1956, he deemed it quite important that plans be prepared for this undertaking so that the expansion program could be undertaken just as soon as the corporate finances would permit. After a general discussion of the suggested expansion program, it was duly moved, seconded and carried, that the President be authorized to employ a reliable architect to draw up plans for both the addition to the warehouse and for the addition of another floor to the present office building. The minutes of the meeting of the stockholders of Bardahl Manufacturing Corporation held February 26, 1957, stated in pertinent part: The President announced that the expansion plans contemplated in 1956 were now taking shape and that new walk-in vaults would also be added to the present office building. Plans are presently being completed by one of the *144 well-known Seattle architectural firms. The minutes of the special meeting of the board of directors of Manufacturing held on August 14, 1957, contained the following statement: C. B. Merritt presented the current financial statement to the Board, outlining to the Board the financial condition of the business, and the progress being made in the new additions which would be dedicated in the very near future, stating also that the greater portion of the estimated $300,000.00 capital outlay has already been expended. The minutes of the annual meeting of the stockholders of Manufacturing held February 28, 1958, stated in part as follows: C. B. Merritt outlined the progress
$300,000.00
made in the estimated expan-
sion program provided for in
1956, in connection with which
there had been expended to date
for new buildings, equipment
and tank farm, approximately
229,000.00
leaving an unexpended estimate
balance of
$ 71,000.00
to which should be added a fur-
ther expansion estimate of
50,000.00
Total
$121,000.00
Of the total estimated expansion
balance of
$121,000.00
it was estimated that expendi-
tures in 1958-1959 for capital
items would be in round figures
as follows: New equipment in
plant
$47,500.00
New office equip-
ment
8,500.00
Building additions
3,000.00
Additions to tank
farm
62,000.00
$121,000.00
*145 The Secretary stated that, in his opinion, it might be good financial policy to hold a minimum and dividend payment in 1958, in order to retain sufficient liquid capital to meet not only current working capital needs, but also to provide necessary funds to complete the above expansion proposals. The minutes of the annual meeting of the board of directors of Manufacturing held February 28, 1958, contained a statement substantially identical to that last quoted above. A number of architectural drawings relating to petitioner's proposed warehouse additions, tank farm, and office building additions were prepared and certified by a registered architect during 1957, 1958, and 1959. The first of such drawings was certified on May 3, 1957, and the last was certified on July 28, 1959. After completion of the second floor addition to petitioner's office structure, some of the additional space was occupied by Bardahl International Corporation and its rent was increased in 1958 from $725 per month to $1,500 per month. During the years 1956 through 1959, Manufacturing converted its production operation from a batch-type process to a continuous process. This change involved an expansion *146 of petitioner's plant facilities which prior to 1956 were inadequate to accommodate a continuous operation. The cost savings to the corporation resulting from the change in manufacturing technique amounted to at least $30,000 a year during the years here involved. The net expenditures (after salvage recoveries) made by Bardahl Manufacturing Corporation during 1956, 1957, 1958, 1959, and 1960 for the acquisition of additional equipment and plant, warehouse, and office facilities were $76,013.93, $112,947.41, $245,500.32, $123,571.12, and $106,553, respectively. As of December 31, 1956, 1957, 1958, and 1959, petitioner's board of directors had formed specific and definite plans for the expenditure of $220,610, $245,500, $123,571, and $106,553, respectively, for the purpose of acquiring additional equipment, expanding its plant and warehouse facilities, and adding office space. Raw Materials Certain chemical compounds and raw materials are basic ingredients in the manufacture of Bardahl concentrate. One indispensable chemical component is a special type of lead naphthenate. At all times here material it was necessary for petitioner to maintain a raw materials reserve of various *147 chemicals in order to consistently maintain its level of production. Certain of these chemical ingredients which are indispensable to the production of the corporation's Bardahl additive occasionally have become quite difficult to obtain as a result of changes in world conditions. Throughout the years 1956 through 1959, and over a span of approximately 20 years, petitioner purchased several of its essential raw materials from W. Ronald Benson, a chemical engineer, manufacturer's representative, and proprietor of a chemical supply business. As a manufacturer's representative Benson sold Manufacturing each year approximately $200,000 worth of raw materials during the years 1956 through 1959. In conjunction with the chemists and employees of Bardahl Manufacturing Corporation he formulated certain chemical components exclusively for petitioner's use. During 1951, one of the ingredients essential to the production of a chemical compound used in the manufacture of Bardahl concentrate disappeared from the market and it became necessary for petitioner to spend approximately $75,000 in cash in order to stockpile the ingredient in sufficient quantity to enable it to remain in production. *148 During the years 1956 through 1959, W. Ronald Benson discussed with Ole Bardahl, president of Manufacturing, and also with its chief chemist and its secretary-treasurer, the possibility of emergency situations arising which would cut off the supply of raw materials needed for the production of chemical compounds used in the manufacture of Bardahl concentrate. Benson warned the officers of Manufacturing that shortages of such raw materials could force the corporation to stop production and he accordingly alerted them that it might become necessary to stockpile a surplus of raw materials on short notice. He advised petitioner's officers that in the event of an emergency it would be necessary to spend at least $100,000 in cash in order to acquire a stockpile of raw materials sufficient to enable it to remain in production through the emergency period. As of December 31, 1956, 1957, 1958, and 1959, inclusive, petitioner reasonably anticipated the expenditure of at least $100,000 cash for the stockpiling of essential chemicals and raw materials in the event of emergencies which would cut off the supply of ingredients indispensable to the manufacture of Bardahl concentrate. Foreign *149 Subsidiaries In May 1958, William G. Simpson, vice president of both Manufacturing and International, was sent to Europe by petitioner to assist several European distributors in marketing Bardahl products, and to investigate the general situation existing among the blenders and distributors there. Upon returning from his European trip, he reported to the board of directors of Manufacturing on September 30, 1958, as follows: When Mrs. Simpson and myself left for Europe, it had been rumored that Mr. Gheysens who was operating a subdistributorship under Kjell Stray in Belgium, was marketing a fraudulent Bardahl product. We investigated this matter and found it necessary to cancel out Mr. Gheysens Belgium operation, as well as Mr. Stray in this territory. A new Belgium Bardahl firm was established under the name of Bardahl Lubricants Belgium, Ltd. During the negotiations which took place in Paris with Mr. Gheysen's attorney, Kjell Stray, Mr. Bagn, Mr. George L. Geddes and our Bardahl attorney representing us, and Mr. Vandenbusch from Antwerp were present. We met with Mr. Nathan Murat in Paris and had an opportunity to talk and discuss the Bardahl operation in France. Through these *150 talks it was learned that Mr. Murat, our Bardahl distributor, and Mr. Geddes were having difficulties that might soon lead to litigation. As a result of the conversation in Paris, we proceeded to inspect the Bardahl operations in Portugal, Florence and London. We found many discrepancies in all of the operations that were under the control of Mr. Geddes. As a result of this trip Mr. Giorgio Geddes and his cousin Mr. Rudolfo Geddes agreed to come to the States and meet with their attorney, and our attorney, to straighten out the misunderstanding that was evident in Europe. The European territory (except England and Scandanavia) for the marketing of Bardahl products, as well as the Far Eastern and South American territories, were under the control of Giorgio Geddes during 1956, 1957, 1958, and until May 1959. Geddes had originally obtained his franchise as a subdistributor from Alex Henderson of Montreal, Canada, the first franchise distributor employed by the Bardahl interests. In January 1959, Giorgio Geddes, Ole Bardahl, and William G. Simpson and their attorneys met in Seattle, Washington, for the purpose of discussing and settling their differences with regard to the operation *151 of the European and South American Bardahl distributorships. The European distributorship accounted for approximately 15 percent of the total sales of Bardahl products. Approximately 70 percent of the Bardahl products sold in the European market were purchased by industrial users and about 30 percent were bought for use in automobiles, whereas in the United States approximately 80 percent of the total sales of Bardahl products were made for automotive use, with 20 percent sold to industrial purchasers. On March 23, 1959, Ole Bardahl and William G. Simpson were authorized by petitioner's board of directors to make a trip to Europe to further investigate market conditions and the operation of the Geddes franchise. Upon their return from Europe they reported their findings to the board of Manufacturing. The minutes of the meeting of the board of directors of the corporation held on April 30, 1959, stated in part: The President then gave a brief outline of his recent European trip in which connection he stated that he was formulating plans for the establishment of the corporation's own blending plants in foreign territory, two in Europe and one in South America, the estimated cost *152 of this expansion plan being somewhere in the neighborhood of $200,000.00. During their European trip Simpson and Bardahl discussed with a Minister of Industry in France and with certain public officials in Italy the possibility of constructing a concentrate plant in either country. Ole Bardahl previously had expressed to W. Ronald Benson his intentions regarding the construction of a concentrate plant to be located in Europe and had requested Benson and the Witco Chemical Company, one of petitioner's suppliers of chemical components, to investigate the sources of chemical supply available in Europe. As a result, officers of Witco Chemical Company sought to confer with Ole Bardahl and William Simpson in Paris, France, for the purpose of discussing sources of raw materials and the feasibility of the construction of a chemical plant in Europe by Witco to serve as a supplier of chemical products for petitioner's contemplated European concentrate plant. The president of Witco was unable to contact Bardahl or Simpson in Europe and later wrote W. Ronald Benson on May 14, 1959, as follows: While Mr. Wishnick and I were in England, Mr. Clarke, of Bardahl, contacted our London Office to *153 see if we were in a position to make raw materials for a plant to be located in the Common Market. I communicated with Mr. Clarke and he stated Mr. Bardahl and Mr. Simpson were in Europe and, from that, we tried very diligently to contact Mr. Bardahl but, apparently, we missed him by a few hours in Paris. However, we did get word to him of our willingness to cooperate on this matter. You will note by the attached copy of letter that I have written directly to Mr. Bardahl to inform him of our regrets at not meeting with him in Europe and offering our whole-hearted support and cooperation in this matter of furnishing him with the type of Lead Naphthenate they require. If they contact you concerning this matter, please get as much information as you can concerning the volume of their requirements and the proposed location of this plant. * * * Max Minnig, president of Witco Chemical Company, also wrote to Ole Bardahl on May 14, 1959: Mr. R. I. Wishnick and I regretted very much that we were unable to make contact with you during our European trip. However, I do want to go on record that we wish to cooperate whole-heartedly with you in the furnishing of raw materials for your operations *154 in the Common Market. We sincerely appreciate the cooperation of your Mr. Clarke, in England, and shall be delighted to hear from either you or Mr. Simpson concerning your requirements in the European area and the possible location of your European Plant. If you wish to transmit this information through Mr. Ronald Benson, this will be perfectly satisfactory. On May 26, 1959, Bardahl International Corporation canceled the European franchise contract held by Giorgio Geddes. On July 15, 1959, International sent Geddes and Alex Henderson letters formally terminating the European franchise. Following cancellation of Geddes' European franchise, William G. Simpson went to Europe to take steps to preserve the market for Bardahl products. On September 29, 1959, an Italian corporation, Bardahl International Oil Corporation, S.P.A., was incorporated by Lillian Simpson, William Simpson, and Amedeo Totaro. The stock of the corporation was held as follows: Lillian Simpson
550,000 Lire
William Simpson
50,000 Lire
Amedeo Totaro
400,000 Lire
On May 20, 1960, petitioner purchased the stock of Amedeo Totaro in Bardahl International Oil Corporation, S.P.A., for $20,000. On *155 May 22, 1960, Manufacturing acquired the stock of William and Lillian Simpson (totaling 600,000 lire) in the Italian corporation for $30,000. All of the stock certificates of Bardahl International Oil Corporation, S.P.A., were endorsed to Bardahl Manufacturing Corporation and deposited with a bank in Milan, Italy. In the fall of 1959 Manufacturing purchased from Giorgio Geddes for $49,000 an inventory of concentrate bearing the Bardahl name which subsequently was destroyed. The reason for the purchase of the inventory was to prevent the overstocking of dealers and a saturation by Geddes of the European market for Bardahl products. Bardahl International Oil Corporation, S.P.A., entered into an agreement with a refinery located in Genoa, Italy, pursuant to which the refinery agreed to furnish materials and blending facilities for a 1-year period. This arrangement was intended by Manufacturing as a temporary measure to keep the European distributors in business until a concentrate plant could be built in that territory. After shipment of the first batch of concentrate to Italy, Manufacturing assigned a man to the refinery in Genoa to supervise the blending and production process on *156 behalf of Bardahl International Oil Corporation, S.P.A. One of the principal reasons for petitioner's decision to establish a concentrate plant in Europe was the high rate of duty on imported Bardahl concentrate. The duty rate on shipments of concentrate to Italy or Spain during 1958 and 1959 was between 65 percent and 75 percent of the invoice price. In other countries the duty rate varied from 50 percent to nearly 100 percent of the invoice price. The officers of Manufacturing were informed that with a concentrate plant located in Europe its Italian subsidiary would be able to take advantage of certain benefits in marketing Bardahl products in the European Common Market. Manufacturing's decision to create a subsidiary corporation in Italy also was influenced by the fact that otherwise it would be subject to corporate liability in Italy as a result of establishing a concentrate plant there. An additional incentive for the formation of Bardahl International Oil Corporation, S.P.A., was the fact that Manufacturing thereby would be able to avoid disclosing its financial statements to the Italian Government thus reducing its tax burden in Italy. The minutes of the meeting of the *157 board of directors of Manufacturing held December 16, 1959, stated: The members of the board expressed their concern with reference to the conditions found by Mr. Simpson in his travels to the various countries covered in his report. All members were now made to realize that some immediate action must be taken in order to recover the market that we so nearly lost. It was regularly moved and seconded and passed of the board that the sum of $257,000 be set aside and allocated to be used where needed and in the manner later to be determined in an effort to recover the market. From November 28, 1959, through February 24, 1960, Manufacturing advanced supplies of chemicals and raw materials to its Italian subsidiary in the total amount of $61,153.41. Such advancements subsequently were repaid by Bardahl International Oil Corporation, S.P.A., during 1960, 1961, and 1962. During the spring of 1960 petitioner's wholly-owned subsidiary corporation in Italy was able to achieve steady production and to deliver supplies of Bardahl products to its European distributors. The distributorship held by Alex Henderson originally included the eastern portion of both the United States and Canada. *158 During the years in issue Henderson's franchise territory was confined to eastern Canada wich accounted for approximately 20 percent of the total sales of Bardahl products. On January 15, 1960, a franchise contract was executed by Alex Henderson and Bardahl International Corporation with respect to the distribution of Bardahl products in eastern Canada. On August 11, 1960, Henderson unexpectedly canceled the franchise agreement he had with International covering the entire eastern Canadian territory. The franchise termination was formally accepted by International on August 15, 1960. On September 18, 1960, B.D.L. Lubricants, Ltd., was incorporated in Canada. The name of the corporation subsequently was changed to Bardahl Lubricants (Canada), Ltd. The outstanding common stock of Bardahl Lubricants (Canada), Ltd., at all times here material was held as follows: No. of
Shareholder
shares
Bardahl Manufacturing Cor-
poration
503
Stephen Swantz
1
Jacques Tetrault
1
Ole Bardahl
1
Inga Bardahl
1
W. G. Simpson
1
Evelyn Nicolaysen
1
R. E. Parsons
1
Total
510
On September 24, 1960, Manufacturing and Alex Henderson executed an agreement under which *159 petitioner agreed to pay Henderson $25,000 for a covenant not to compete with it in the manufacture or sale of products similar to Bardahl in Canada. On December 2, 1960, petitioner transferred $143,268.31 to Bardahl Lubricants (Canada), Ltd., which was used by it to purchase the inventory, supplies, materials, and the Bardahl trademark from the corporate blender and distributor controlled by Henderson. Manufacturing advanced $46,480.50 to its Canadian subsidiary corporation on January 27, 1961, which was used by it for the construction of a concentrate plant located in Canada. During the years 1960 to 1962, Bardahl Lubricants (Canada), Ltd., purchased land for a plant site and commenced construction of a building. As of December 31, 1962, Manufacturing had advanced as loans to Bardahl Lubricants (Canada), Ltd., a total of $498,742.71 (including the above-mentioned advances in the amount of $143,268,31 and $46,480.50. A portion of the above-described advances was paid out of funds that had been designated by petitioner's board of directors on December 16, 1959, for the reestablishment of the market in Europe for Bardahl products. Part of these funds were diverted to the Canadian *160 market during 1960 through 1962 because of the unexpected termination by Alex Henderson of his franchise agreement. Petitioner limited its equity investment in its Canadian subsidiary during 1960, 1961, and 1962 to $510 so as to be in a position to recover the funds advanced and to enable Bardahl Lubricants (Canada), Ltd., to deduct its interest expense in computing its Canadian tax liability. On October 12, 1961, Bardahl Lubricants (Canada), Ltd., borrowed $100,000 from the Canadian Imperial Bank of Commerce. The loan was personally guaranteed by Ole Bardahl. As of December 31, 1959, Manufacturing's officers and directors had formed specific and definite plans for the expenditure of $257,000 for the rehabilitation of the European market for Bardahl products. Drawing Account During the years here in question Bardahl Manufacturing Corporation maintained a drawing account for its president Ole Bardahl. The purpose of the drawing account was to make cash advances and to pay certain personal bills during his absence from the home office. Ole Bardahl traveled extensively in connection with the conduct of petitioner's business operations during 1956, 1957, 1958, and 1959. Petitioner *161 paid Ole Bardahl's Federal income taxes during January of each of those years. It was the consistent practice of Ole Bardahl to make substantial cash payments to Manufacturing in reduction of his temporary loan balance at various times during each of the years in issue and to make payment in full satisfaction of his account during December of each year. During April 1958, Ole Bardahl sold a residence to International in exchange for the assumption by that corporation of a mortgage in the amount of $15,152.39 and a demand note in the amount of $84,847.61 bearing 4 percent interest. In December 1958, petitioner's president delivered to it the foregoing promissory note issued to him by International in the amount of $84,847.61, and a note executed by him in the amount of $45,000 bearing bank interest. The delivery to Manufacturing of the two abovedescribed notes by Ole Bardahl constituted partial payment of his drawing account balance for that year. The note for $84,847.61 was paid in full with interest on September 10, 1959, and the $45,000 note bearing bank interest was paid in five installments made during the period March 1959 through September 1959. Real Estate Investment *162 Prior to the formation of Manufacturing in 1939, Ole Bardahl had been engaged for 20 years in the business of land development and the construction of houses. He had constructed approximately 400 houses in Seattle, Washington, prior to 1940. David Harvey, a friend and former business associate of Ole Bardahl, approached him in 1955 concerning the possibility of investing in a land development venture. Bardahl caused petitioner to invest funds in the development of a subdivision known as Bardahl Parks as a joint venturer with David Harvey. Petitioner's investment in Bardahl Parks was in the following amounts at the end of each of the years 1955 through 1959: Year
Amount
1955
$79,902.44
1956
86,332.58
1957
62,148.50
1958
52,794.61
1959
26,163.99
David Harvey and Ole Bardahl selected jointly the parcel of land to be developed. Petitioner did not participate in the management of Bardahl Parks. David Harvey supervised the addition of improvements to the undeveloped land and also conducted the sale of lots. He shared equally with Manufacturing any profits resulting from the sale of lots in Bardahl Parks. After petitioner and David Harvey began their joint undertaking *163 in Bardahl Parks the cost of unimproved land rose so sharply that Ole Bardahl decided to terminate any further joint ventures in real estate. In 1958 and 1959 Manufacturing invested $27,072.64 and $15,916.55, respectively, in another land development project known as Sunset Developers. Petitioner's investments in the Bardahl Parks and Sunset Developers real estate projects during the years in issue were unrelated to its oil additive business and did not constitute a diversification of business activity. A parcel of land situated adjacent to petitioner's plant was offered to Manufacturing in 1959 by its owners, Dickey and Clauson, for $80,000. The offer was refused because the officers of the corporation felt that the asking price was excessive. On April 13, 1960, Manufacturing purchased the abovementioned parcel from Dickey and Clauson for $75,000. On the same date petitioner leased the property to Dickey and Clauson for a period of 10 years with the understanding that the lessees could vacate the premises at any time. As of December 31, 1959, petitioner had not formed a specific and definite plan for the expenditure of any of its funds for the acquisition of the property *164 subsequently purchased from Dickey and Clauson. Loans During 1955 Manufacturing loaned Harvey $30,000 for the purpose of protecting its interest in the Bardahl Parks development. This loan in the amount of $30,000 was still outstanding at the close of 1956. During 1957 petitioner accepted a mortgage from Albert Anderson in the amount of $21,750 in satisfaction of the Harvey loan. The amount of the outstanding mortgage from Albert Anderson was reduced to $21,444.62 as of December 31, 1957, and was further reduced to $20,808.94 as of December 31, 1958. This mortgage was replaced in 1959 by a mortgage from Melvin Heide in the amount of $20,754.32 which was reduced to $20,136.68 as of December 31, 1959. [1]
Manufacturing loaned W. A. Watts, an electrical contractor, $12,000 in exchange for his promissory note in that amount in 1955. The outstanding balance on petitioner's loan to W. A. Watts was increased to $20,000 *165 as of December 31, 1956, and was decreased to $8,000, $6,000, and $4,000 as of the end of 1957, 1958, and 1959, respectively. In 1957 petitioner accepted conveyance of a dwelling house from W. A. Watts in partial satisfaction of its outstanding loan to him. [2] In 1959 petitioner sold the house to E. R. Rollin for $31,500. Rollin executed and delivered to petitioner a mortgage in that amount. The amount of the outstanding mortgage from E. R. Rollin was reduced to $30,729.04 as of December 31, 1959. None of the above-described loan transactions were related to Manufacturing's business. Dividend Policy The policy of petitioner consistently has been to finance its operations and capital investments with cash whenever possible. The officers of the corporation, since the commencement of its operations in 1939, have been opposed to the utilization of borrowed funds unless forced to do so. With the exception of the construction of a plant in 1951 which required petitioner to borrow $60,000, it has not financed *166 its equipment acquisitions or capital improvements with borrowed funds. Manufacturing's board of directors generally based its decisions as to dividend distributions at the close of each of the years here in question upon the recommendations of its secretary-treasurer, C. B. Merritt, or its president, Ole Bardahl. Petitioner's net income after taxes, its outstanding capital stock, its net earnings per share after taxes, cash dividends declared per share, the percentage of its net income after taxes distributed as dividends, and the percentage of net earnings after taxes retained as of the end of 1956, 1957, 1958, and 1959 were as follows: Percent
of net
Percent
Stock
Per
earnings
of net
outstanding
share
after taxes
earnings
on
net
Cash
distributed
after
Net income
dividend
earnings
dividends
as cash
taxes
Year
after taxes
date
after taxes
per share
dividend
retained
1956
$198,925.46
12,500
$15.91
$4
25.14
74.86
1957
258,387.76
15,000
17.23
2
11.61
88.39
1958
369,755.16
17,500
21.13
1
4.73
95.27
1959
458,225.00
20,000
22.91
5
21.82
78.18
Several of the *167 above findings are summarized in the following table: (1)
(2)
(3)
Increase in
Net liquid as-
earnings
sets available
and prof-
to meet an-
Accumulated
its over
ticipated
Year ended
earnings and
prior
business
Dec. 31 - profits
years
needs
1955
$ 819,686
1956
965,040
$145,354
$ 500,063
1957
1,194,483
229,443
639,824
1958
1,540,049
345,566
764,789
1959
1,880,097
340,048
1,090,729
(4)
(5)
(6)
Total needs of
business for
Ordinary oper-
Anticipated
liquid as-
ating expenses
extraor-
sets (Col.
Year ended
for one busi-
dinary
4 plus
Dec. 31 - ness cycle
expenses
Col. 5)
1955
1956
$293,400
$320,610
$614,010
1957
480,000
345,500
825,500
1958
488,000
223,571
711,571
1959
488,100
463,553
951,653
(7)
(8)
(9)
(10)
Amount accu-
Excess or
mulated be-
(shortage)
Investment in
Loans unre-
yond reason-
of work-
unrelated
lated to
able needs
Year ended
ing capi-
proper-
busi-
of busi-
Dec. 31 - tal
ties
ness
ness
1955
1956
($113,947)
$86,333
$50,000
$ 22,386
1957
( 185,676)
62,148
29,445
0
1958
53,218
79,868
26,809
159,895
1959
139,076
42,081
54,866
236,023
*168 Manufacturing's income tax returns and its books and records were examined by the Commissioner's agents during July 1961. On October 2, 1962, respondent mailed petitioner a notification that he proposed to issue a notice of deficiency for the years 1956, 1957, 1958, and 1959 determining a deficiency under section 531 of the Internal Revenue Code of 1954 relating to the accumulated earnings tax. In response thereto petitioner filed with the respondent a statement containing certain grounds and allegations on which it sought to rely in support of the retention of its undistributed current and accumulated earnings and profits. On March 28, 1963, the respondent mailed petitioner a notice of deficiency determining that its earnings and profits were accumulated beyond the reasonable needs of its business and that it was availed of for the purpose of avoiding the income tax with respect to its shareholders by permitting its earnings and profits to accumulate instead of being distributed. Ultimate Findings During 1956, 1958, and 1959, petitioner permitted its earnings and profits to accumulate beyond the reasonable needs of its business to the extent of $22,386, *169 $159,895, and $236,023, respectively. In each of the years 1956, 1958, and 1959 Bardahl Manufacturing Corporation was availed of for the purpose of avoiding the income tax with respect to its shareholders by permitting earnings and profits to accumulate instead of being divided or distributed. During 1957 petitioner did not permit its earnings and profits to accumulate beyond the reasonable needs of its business and in that year it was not availed of for the purpose of avoiding the income tax with respect to its shareholders by permitting its earnings and profits to accumulate instead of being divided or distributed. Opinion Sections 531 and 532 of the Code impose an accumulated earnings tax upon corporations availed of for the purpose of avoiding the income tax with respect to their shareholders by permitting earnings and profits to accumulate instead of being divided or distributed. Section 533(a) provides that the fact that the earnings and profits of a corporation are permitted to accumulate beyond the reasonable needs of the business shall be determinative of the purpose to avoid the income tax with respect to shareholders unless it shall prove to the contrary by a preponderance *170 of the evidence. Under section 537 the "reasonable needs of the business" include the reasonably anticipated needs of the business. Under section 534 the burden of proof in proceedings before this Court may be shifted to the respondent with respect to a determination that the earnings and profits of a corporation have been permitted to accumulate beyond its reasonable business needs if: (1) the Commissioner has mailed the taxpayer notification of his intention to impose the accumulated earnings tax and (2) the taxpayer has submitted a timely statement of the grounds (together with facts sufficient to show the basis thereof) on which it relies to establish that all or any part of its earnings have not been permitted to accumulate beyond its reasonable business needs. In order to effectuate a partial shift of the burden of proof to the Commissioner, the statement submitted by a taxpayer pursuant to the provisions of section 534 must set forth facts supporting the grounds contained therein which are substantial, material, and definite. American Metal Products Corporation, 34 T.C. 89, affd. 287 F. 2d 860; I. A. Dress Co., 32 T.C. 93, affd. *171 273 F. 2d 543, certiorari denied 362 U.S. 976. The respondent mailed petitioner proper notification pursuant to section 534 and the corporation in turn filed a statement in response thereto. In view of the state of the record here presented we find it unnecessary to determine the adequacy or inadequacy of petitioner's statement to accomplish any shifting of the burden of proof to the respondent. See I. A. Dress Co., supra.Our conclusions herein rest upon the clear and convincing evidence presented and would remain the same regardless of which party bears the burden of proof with respect to any or all of the grounds contained in petitioner's section 534 statement. We have commenced our analysis of the evidence presented by first ascertaining the amount of net liquid assets available to petitioner at the close of each of the years in question so as to determine whether it possessed sufficient liquid funds to enable it to meet its reasonably anticipated business needs and still permit the distribution of additional dividends to its stockholders. See Gus Blass Co., 9 T.C. 15; Sauk Investment Co., 34 B.T.A. 732. We have *172 determined from the record that petitioner had available liquid working capital as of December 31, 1956, 1957, 1958, and 1959 in the amounts of $500,063, $639,824, $764,789, and $1,090,729, respectively. In our computation of Manufacturing's current assets as of the end of each of the years in issue we have included items representing the equivalent of cash, such as Treasury bills and Government securities. The record discloses that petitioner's 8 percent debentures in the total face amount of $40,000 issued by the Coast Mortgage Company were cashable on demand pursuant to an agreement between Manufacturing and the issuer thereof and that during the years in question the Coast Mortgage Company consistently maintained a cash reserve for bond redemptions. Accordingly, we also included the $40,000 Coast Mortgage Company debentures in determining petitioner's current assets at the end of each of the years before us. In our computation of the current liabilities of Manufacturing at the close of each year we have included its provision for Federal income taxes payable for the indicated year. See Kerr-Cochran, Inc., 30 T.C. 69, at 73, 74; Sandy Estate Co., 43 T.C. 361, 377. *173 Turning next to a consideration of the reasonably anticipated needs of petitioner's business at the close of each of the years here in question, we must first determine the amount of working capital which it reasonably anticipated as sufficient to finance its expected costs of normal operations. Earnings retained to provide for working capital requirements are accumulated for the reasonable needs of the business. Section 1.537-2(b)(4), Income Tax Regs.
On brief, the respondent contends that the amounts of working capital required by petitioner as of the end of 1956, 1957, 1958, and 1959 to cover its anticipated operating costs were $322,965, $348,180, $396,500, and $435,243, respectively. Petitioner claims that it required as of the close of each of the years before us a working capital reserve to finance its expected costs of operation in the amounts of $448,132, $499,182, $632,496, and $726,984, respectively. Manufacturing does not contend that its reasonably anticipated business needs as of the close of each of the years before us required a working capital reserve in an amount sufficient to cover the cost of its operations for an entire year. Cf. *174 J. L. Goodman Furniture Co., 11 T.C. 530; Sandy Estate Co., supra.
In view of the nature of petitioner's business, the amounts of its inventories and the rate of inventory turnover, the amount of its accounts receivable, and the collection rate thereof, we would be unable to find on the record before us that a cash reserve sufficient to cover one year's operating costs would be justified. The parties appear to agree on brief that the most appropriate basis for determining petitioner's need for operating capital is to compute the amount of cash reasonably expected as being sufficient to cover its operating costs for a single operating cycle. See Smoot Sand & Gravel Corporation v. Commissioner, 274 F. 2d 495, affirming a Memorandum Opinion of this Court; United States v. McNally Pittsburg Manufacturing Corp., 342 F. 2d 198. The evidence discloses that the corporation's operating cycle, consisting of the period of time required to convert cash into raw materials, raw materials into an inventory of marketable Bardahl products, the inventory into sales and accounts receivable, and the period of time required to collect its outstanding *175 accounts, averaged approximately 4.2 months during the 4 years here involved. Thus the length of Manufacturing's operating cycle during the period 1956 through 1959 averaged approximately 35 percent of a year. In our view, at the beginning of each year petitioner would need liquid assets to meet operating expenses for a maximum of only 4.2 months on the assumption that no operating revenue would be received until the expiration of its operating cycle. Additional expenditures for operating costs beyond the first 4.2 months of each year would not be incurred without the production of operating revenue. We accordingly have computed the amounts of working capital needed to finance Manufacturing's reasonably anticipated costs of normal operations as being approximately 35 percent of its expected annual operating costs and cost of goods sold. Its total annual cost of goods sold and operating costs consistently increased throughout the years here in issue. We have determined that the amounts of liquid working capital which reasonably could have been anticipated by Manufacturing as being necessary to finance its costs of normal operations as of December 31, 1956, 1957, 1958, and 1959 were *176 $293,400, $480,000, $488,000, and $488,100, respectively. In making the above computation of petitioner's working capital requirements, we have considered all of its expenses as shown in its profit and loss statements, including both direct and indirect expenses (except depreciation), and its cost of goods sold. We have eliminated from our computation of funds necessary for petitioner's operating costs for one operating cycle any consideration of its anticipated Federal income taxes for the following year since this is not the kind of operating expense for which cash is needed in advance. Federal income taxes would be incurred in the following year only if there arises sufficient earnings from profitable future operations to require their imposition. The parties on brief devote considerable argument to the question whether petitioner needed funds for advertising expenses and whether the retention of cash to meet its anticipated advertising expenses was justifiable. It is not entirely clear from petitioner's brief whether it claims that during the years here involved it was entitled to maintain a separate cash reserve exclusively to meet its advertising costs or whether its argument *177 as to this item is merely one aspect of its broader contention regarding its need for working capital to finance normal operating costs for one operating cycle. In our computation of the amount of working capital which petitioner at the end of each of the years in question reasonably could have anticipated as being needed to finance its normal operating costs for a single operating cycle, we have taken into account its expected advertising expenses. In concluding that it was entitled to accumulate a sufficient cash reserve to meet its estimated operating expenses for 4.2 months, we have permitted it to accumulate sufficient cash to cover approximately 35 percent of its anticipated annual advertising costs. The record demonstrates to our satisfaction that petitioner's reasonable business needs did not require any additional accumulation of liquid assets to meet expected advertising expenses as of the close of any of the years before us. Petitioner also contends that at the end of each of the years in question it had formed specific and definite plans for the expenditure of substantial amounts of cash for the expansion of its plant and office facilities and that it was entitled to *178 accumulate liquid assets to the extent thereof. Section 1.537-2(b)(1), Income Tax Regs. The minutes of several meetings of the board of directors of Bardahl Manufacturing Corporation held during 1956, 1957, and 1958 clearly demonstrate that the corporation had specific and definite plans to construct additions to its warehouse, office building, and tank farm in the immediate future. Further, it engaged the services of a registered architect who prepared and certified a set of architectural drawings relating to these proposed additions to petitioner's plant and office facilities. The first of such drawings was completed and certified by the architect on May 3, 1957, and the last of the series was completed and certified on July 28, 1959. The record discloses that one of Manufacturing's principal purposes in expanding its plant facilities was to enable it to convert its production from a batch-type process to a continuous process, a change which was completed during the years in question, and which resulted in an operating cost saving to the corporation of at least $30,000 a year due to the change in its manufacturing technique. Petitioner actually completed *179 most of its contemplated expansion projects during the years before us. Its net expenditures, after salvage recoveries, for the acquisition of additional equipment, plant, warehouse, and office facilities were $76,013.93, $112,947.41, $245,500.32, $123,571.12, and $106,553 during 1956, 1957, 1958, 1959, and 1960, respectively. We have determined that as of December 31, 1956, 1957, 1958, and 1959 Manufacturing had formed specific and definite plans for the expenditure of $220,610, $245,500, $123,571, and $106,553, respectively, for the expansion of its plant and office facilities. An additional extraordinary expense which was reasonably anticipated by the corporation at the close of each of the years involved was an emergency fund in the amount of approximately $100,000 which was needed throughout the 4 years in issue to finance the stockpiling of chemicals and raw materials in the event of sudden changes in world conditions. It is apparent from the record that it was necessary at all times during the 4-year period in question for petitioners to maintain a raw materials reserve of various chemicals in order to maintain a consistent level of production. Certain of the chemical ingredients *180 which are indispensable to the production of the Bardahl additive occasionally have become scarce as a result of changes in world conditions. During 1951, one of the essential raw materials needed by petitioner in the production of its Bardahl concentrate disappeared from the market and the corporation found it necessary to spend approximately $75,000 in cash in order to stockpile the ingredient in a quantity sufficient to allow it to remain in production. One of petitioner's suppliers of chemical products who was a chemical engineer and who had sold chemical products to Manufacturing over a period of approximately 20 years, testified that he had advised its officers during the years 1956 through 1959 that in the event of a sudden change in world conditions an emergency situation might well arise which would necessitate the expenditure of at least $100,000 in cash to enable the corporation to acquire a stockpile of raw materials sufficient to allow it to continue its normal level of production. We are convinced from the record that a corporation engaged in the type of business operated by petitioner, being dependent upon a continuous supply of chemicals and raw materials drawn *181 from different sources throughout the world, would require a cash reserve to enable it to obtain a sufficient quantity of materials to remain in business during emergency periods. It is therefore our conclusion that a business need actually existed for the accumulation of a reserve to meet such a contingency. See L. R. Teeple Co., 47 B.T.A. 270; William C. Atwater & Co., 10 T.C. 218. We are persuaded by the testimony herein that petitioner's officers reasonably anticipated the need for a reserve of at least $100,000 as of December 31, 1956, 1957, 1958, and 1959 for the stockpiling of essential chemicals and raw materials in the event of emergencies which would cut off the supply of ingredients indispensable to the manufacture of Bardahl concentrate and we have so found. With respect to the reasonable needs of the corporation existing at the close of 1959 it claims that in addition to expected expenditures for normal operating costs, plant expansion and the emergency stockpiling of raw materials essential to its operations, it anticipated the expenditure of $257,000 as of December 31, 1959, for the rehabilitation of its European market, capital investments *182 in an Italian subsidiary and the construction of a concentrate plant to be located in Europe. It accordingly contends that it was justified in accumulating liquid assets in that amount at the end of 1959 for such purposes. During 1956, 1957, 1958, and until May 1959, the European territory for the sale of Bardahl products as well as the Far Eastern and South American territories was under the control of Giorgio Geddes. The European distributorship produced approximately 15 percent of the total sales of Bardahl products. Petitioner's officers made trips to Europe in 1958 and 1959 and discovered a number of irregularities in the operation of Giorgio Geddes' distributorship which seriously hampered the marketing of Bardahl products in the territory under his control. During 1959 Bardahl International Corporation terminated Geddes' European franchise. The officers of Manufacturing thereupon began to take steps to investigate the possibility of constructing a concentrate plant in Europe and forming an Italian corporation to serve as a subsidiary of petitioner for the production of Bardahl concentrate for the European market. The minutes of the meeting of petitioner's board of directors *183 held April 30, 1959, show that its officers had previously formulated plans for the construction of one or two concentrate plants in Europe as well as one in South America. The estimated costs of constructing the three plants was placed at $200,000. During 1959 the president and vice president of Manufacturing discussed with government officials in France and Italy the possibility of erecting such a plant in one country or the other. They also investigated the sources of raw materials available in Europe and approached at least one supplier of chemicals which expressed interest in constructing its own European chemical plant for the purpose of supplying petitioner's contemplated concentrate plant in that area. One of the principal reasons for Manufacturing's decision to construct a concentrate plant in Europe was the opportunity to avoid the high rate of duty on imported Bardahl concentrate. During 1958 and 1959 the duty rate on shipments of concentrate to Italy or Spain was between 65 percent and 75 percent of the invoice price. Petitioner's officers were informed that with a concentrate plant located in Europe its contemplated Italian subsidiary would be able to take advantage *184 of certain benefits in marketing Bardahl concentrate in the European Common Market. On September 29, 1959, Manufacturing's vice president, William G. Simpson, caused an Italian corporation to be formed under the name of Bardahl International Oil Corporation, S.P.A., the stock of which was held temporarily by three individuals and later was acquired by Bardahl Manufacturing Corporation in May 1960 for $50,000. During 1959 Bardahl International Oil Corporation, S.P.A., entered into an agreement with a refinery located in Genoa, Italy, under which the refinery agreed to furnish petitioner's Italian subsidiary with materials and blending facilities for a 1-year period. Manufacturing later assigned a man to work with the refinery in Genoa to supervise the blending and production of Bardahl concentrate on behalf of Bardahl International Oil Corporation, S.P.A. One of the principal purposes for the formation by petitioner of a subsidiary corporation in Italy was the avoidance by Manufacturing of corporate liability in Italy upon establishing a concentrate plant there. In the fall of 1959, Manufacturing purchased from Giorgio Geddes for $49,000 an inventory of concentrate bearing the Bardahl *185 name in order to prevent his overstocking the dealers in Europe and thereby saturating the European market. From November 28, 1959, through February 24, 1960, petitioner advanced supplies of raw materials in the amount of $61,153.41 to its Italian subsidiary. The minutes of the meeting of petitioner's board of directors on December 16, 1959, state that its directors formally resolved to set aside $257,000 of its funds for use in reestablishing the European market for Bardahl products. During the spring of 1960 petitioner's Italian subsidiary achieved a steady level of production. On August 11, 1960, Alex Henderson unexpectedly canceled his franchise agreement with International covering the eastern Canadian territory. As the result of the unanticipated emergency which disrupted the Canadian distributorship for Bardahl products, petitioner in September 1960 formed a Canadian subsidiary known as Bardahl Lubricants (Canada) Ltd. In order to capitalize its Canadian subsidiary with funds sufficient to enable it to purchase inventory, supplies, and land for use as a plant site and to enable it to commence construction of a concetrate plant in Canada, Manufacturing found it necessary *186 to divert to the Canadian market in 1960, 1961, and 1962 a portion of the funds that had been designated by its board of directors on December 16, 1959, for the recovery of the European market. In view of the extensive groundwork that had been laid by petitioner's officers during 1959 for the construction of a concentrate plant in Europe, the formation of its Italian subsidiary in September 1959, the clear statements contained in the minutes of its directors' meetings held April 30, 1959, and December 16, 1959, allocating $257,000 of its funds for the reestablishment of its European market, and the actual expenditure in 1960 of roughly $110,000 in cash and raw materials for the capitalization of its Italian subsidiary and the rehabilitation of its European market, we are of the opinion that on December 31, 1959, petitioner had formed specific and definite plans for the expenditure of $257,000 for the purpose of reestablishing its market in Europe for Bardahl products. In further support of its accumulation of liquid assets as of the close of 1959, Manufacturing advances the argument that it anticipated the expenditure of approximately $80,000 for the acquisition of a parcel of *187 land located adjacent to its plant site in Seattle, Washington. This property was offered to petitioner in 1959 by its owners, Dickey and Clauson, for $80,000. Their offer was refused. Subsequently, however, in April 1960, Manufacturing purchased the parcel of land from Dickey and Clauson for $75,000. On the date of purchase petitioner leased the property back to the sellers for a period of 10 years. It appears from the record herein that petitioner has never made any use whatever of this parcel of land. It is apparent from the evidence before us that the Dickey-Clauson property was not needed by petitioner in its business and that on December 31, 1959, it had not formed any definite plan for the expenditure of any amount for the acquisition of such property. We therefore have not allowed petitioner to accumulate any amount of its liquid assets for this purpose in ascertaining its reasonably anticipated expenses as of December 31, 1959. The respondent emphasizes on brief that petitioner has unjustifiably accumulated at least $469,561, $488,224, $748,426, and $579,336 at the end of 1956, 1957, 1958, and 1959, respectively, because it is claimed that Manufacturing held unrelated investments *188 and made loans to its principal stockholder to the extent of those total amounts. A very substantial proportion of the foregoing totals represents amounts invested by petitioner in Government bonds, Coast Mortgage debentures, and cash on deposit with a savings and loan association. We conclude from the record that these amounts represent temporary investments by Manufacturing of its liquid assets which its officers believed it might need to withdraw at any time in order to finance the cost of operation or expansion. We are convinced that petitioner throughout its history has consistently followed a policy of financing its operations and expansion activities with cash insofar as possible. In our view the amounts represented by petitioner's savings and loan deposit, its investment in Government bonds and its Coast Mortgage debentures do not represent a diversion of the corporation's funds to unrelated activities. As noted above, we have included these amounts in our computation of Manufacturing's current assets in calculating its available working capital at the close of each of the years here involved. The respondent's calculation of petitioner's unrelated investments for 1958 includes *189 an outstanding trade receivable from Bardahl International Corporation in the amount of $81,787.17 which arose in the ordinary course of business operations and which was paid in full during January 1959. This item quite obviously does not represent a diversion of petitioner's funds or an investment in unrelated activities. We thoroughly agree with the respondent, however, that the corporation's investments in the Bardahl Parks and Sunset Developers real estate projects during the years in issue were unrelated investments for which its funds were unjustifiably withdrawn. It is clear from the record that the investment of petitioner's funds in these real estate ventures was fundamentally the personal endeavor of its principal stockholder, Ole Bardahl. Neither the joint venture with David Harvey in Bardahl Parks nor the Sunset Developers project was conducted in a manner which would tend to indicate a corporate purpose on the part of Manufacturing to enter the real estate business, and we conclude from the record that these investments did not represent a genuine diversification of corporate activity but were in fact a diversion of corporate funds to a personal project of its principal *190 stockholder which was wholly unrelated to its oil additive business. In addition to its investments in certain real estate projects during the years here involved, Manufacturing loaned money to several individuals for purposes entirely unrelated to its business. The outstanding balances of such loans totaled $50,000, $29,445, $26,809, and $54,866 at the end of 1956, 1957, 1958, and 1959, respectively. The respondent also contends that Manufacturing made a permanent loan to its principal stockholder which was perpetuated throughout the entire 4-year period here involved and which it is argued represented an unjustifiable diversion of corporate funds for the purely personal purposes of its stockholder. The record discloses that the advances in question were made to Ole Bardahl pursuant to a drawing account which was set up primarily for the purpose of taking care of his personal expenses while he was away from Seattle on trips connected with the business of the corporation. He traveled extensively in connection with the conduct of petitioner's business operations during each of the 4 years before us. During January of each year Manufacturing paid Ole Bardahl's Federal income taxes. *191 It was his practice to make substantial cash payments to Manufacturing in reduction of his drawing account balance during each of the years in question and to make payment in full satisfaction of his account during December of each year. In December 1958, Ole Bardahl delivered to Manufacturing a promissory note previously issued to him by International as partial consideration for the purchase of a residence in the amount of $84,847.61 bearing 4 percent interest, and he also delivered to the corporation a note which he personally executed in the amount of $45,000 bearing bank interest. The delivery of these two notes to petitioner was made in partial payment of Ole Bardahl's drawing account balance for 1958. Both notes were paid in full with interest during 1959. In view of the purpose of these drawing account advances and the facts that they were consistently repaid promptly either in the same year or in an immediately subsequent year and that in two instances the corporation was paid interest on loans made to Ole Bardahl, we find that the advances and loans made to him in connection with his drawing account during the years in issue constituted bona fide loans. We are unable *192 to find from the record that the above-mentioned loans and advances were of indefinite duration and should be regarded as a substitute for the distribution of dividends to the corporation's principal stockholder. Since the amounts in question were consistently repaid and since the record indicates that Ole Bardahl intended at all times to repay the corporation the amounts advanced to him, we cannot conclude that the transactions did not represent bona fide loans or that such advances require us to conclude that the funds advanced were unreasonably diverted from the petitioner's business. F. E. Watkins Motors Co., 31 T.C. 288; Corporate Investment Co., 40 B.T.A. 1156. To summarize the several conclusions set forth above, we shall first consider the total accumulations of earnings and profits available as of the close of 1956 and 1957. As indicated by the table appearing near the conclusion of our findings of fact herein, a comparison of petitioner's liquid assets available for the needs of its business with the amounts we have determined to be its reasonably anticipated need for cash at the close of each of the years in question discloses an apparent shortage *193 of working capital at the end of 1956 and 1957. To the extent of Manufacturing's investment in unrelated properties at the end of those years and the outstanding balances of loans made by it for purposes unrelated to its business, any such working capital shortage was solely of its own making. Had petitioner retained the funds which were represented by its net investment in unrelated properties and the loans unrelated to its business at the conclusion of 1956, it would have had available an actual excess of working capital in the amount of approximately $22,386. We accordingly hold that as of December 31, 1956, petitioner had permitted its earnings and profits to accumulate beyond the reasonable needs of its business to the extent of $22,386. However, at the close of 1957, if petitioner had funds available equal to its net loans unrelated to its business and its net investment in unrelated properties, its liquid assets still would have fallen far short of the total needs for cash expenditures which the record has established were reasonably anticipated by its officers and directors at that time. Even with the funds available which the liquidation of such unrelated loans and real *194 estate investments would have produced, Manufacturing nevertheless would have faced a very sizable shortage of working capital at the close of 1957. We are satisfied from the record that the amounts anticipated by the corporation for its expected business needs in the following year substantially exceeded both the available liquid assets and its investments in unrelated loans and real estate ventures. We therefore conclude that as of December 31, 1957, Bardahl Manufacturing Corporation did not accumulate its earnings and profits beyond the reasonable needs of its business. With respect to 1958 and 1959, the total picture is considerably different. A comparison of Manufacturing's available liquid assets at the close of each of those years with its reasonably anticipated business needs discloses a substantial excess of available liquid funds at the end of each year. To such excessive amounts of liquid assets, we have added petitioner's net investments in unrelated real estate ventures and unrelated loans and have determined that it permitted its earnings and profits to accumulate beyond the reasonable needs of its business as of December 31, 1958 and 1959 to the extent of $159,895 *195 and $236,023, respectively. Under the statutory presumption created by section 533(a) of the Code our findings that petitioner allowed its earnings and profits to accumulate beyond the reasonable needs of its business as of the close of 1956, 1958, and 1959 are determinative of the ultimate issue that it was availed of for the purpose of avoiding taxes on its shareholders unless it has demonstrated to the contrary by a preponderance of the evidence. Although the evidence before us discloses that petitioner had followed a consistent policy of financing its operations and capital improvements exclusively with cash expenditures and despite the further fact that it has demonstrated a favorable dividend record which shows that throughout the 4-year period here involved it had distributed an average of approximately 18 percent of its net income (after taxes) as cash dividends to its shareholders, these factors are overridden by its substantial investment in unrelated real estate ventures and its loans made for purposes unrelated to its business throughout each of those years. Accordingly, in addition to the statutory presumption that Bardahl Manufacturing Corporation at the end of 1956, *196 1958, and 1959 was availed of for the purpose of avoiding taxes on its shareholders by reason of the fact that it allowed its earnings and profits to accumulate beyond its reasonable needs, we are of the opinion that the record in its entirety independently demonstrates that such accumulations were in fact due to the purpose of avoiding taxes on its shareholders and we so hold. Decision will be entered under Rule 50. Footnotes
1. Including advertising costs.↩
1. The terms of the arrangement under which petitioner accepted first the mortgage from Albert Anderson in 1957, and subsequently the mortgage from Melvin Heide in 1959 in satisfaction of the original $30,000 loan to David Harvey are not disclosed by the record.↩
2. The terms of the arrangement under which petitioner accepted the house from W. A. Watts in partial reduction of his indebtedness to it are not disclosed by the record.↩